National Union v. Margaret E. Keefe, James E. Keefe and Celeste Keefe.

Gen. No. 16,154.

Margaret E. Keefe and Celeste Keefe, by Joseph F. Purcell, guardian ad litem, Appellants, v. National Union and James E. Keefe, Appellees. Separate Appeals.

Gen. No. 16,155.

1. INTERPLEADER—*status of complainant.* Where money is paid into court under a strict bill of interpleader the complainant must stand absolutely neutral as to the rights of the several claimants to the fund but when the bill is merely in the nature of a bill of interpleader, complainant may litigate the right to affirmative relief.

2. INTERPLEADER—*when complainants are discharged.* Where complainants have interpleaded and the fund in question has been brought into court they should be discharged if no affirmative relief is sought.

3. INTERPLEADER—*when complainant may remain in case after payment of fund into court.* Where the complainant in a bill of interpleader, on paying into court the fund due complainants, seeks affirmative personal relief, he may be allowed to remain in the case to litigate such right.

4. INTERPLEADER—*what will not prevent affirmative relief for complainant.* Affirmative personal relief will not be denied the complainant in a bill of interpleader after he had paid the sum due claimants into court because of the objection that such relief will affect the determination of the claimants' rights to the fund involved.

5. INTERPLEADER—*where answer alleges ultra vires act, complainant may remain in case.* Where an answer to a bill of interpleader, under which the complainant paid into court the sum due under a benefit policy, alleges that the complainant had no power

to designate one of the claimants as beneficiary, the complainant may properly be permitted to remain in the case to have a determination of the question of *ultra vires* thus raised.

6. BENEFIT SOCIETIES—*designation of beneficiary.* The designation of a brother as beneficiary under a benefit certificate is within the power of the benefit society issuing such certificate. where the policy and by-laws declare that the fund shall be paid "to the husband, wife, orphans, families, or other dependents" as the member may direct, and where it further appears that the beneficiary had taken special charge of the insured prior to his marriage, providing for his material wants and looking after his moral well-being.

7. BENEFIT SOCIETIES—*vested interests of beneficiary.* There are no vested interests in the fund designated in a benefit certificate until the death of the member.

8. BENEFIT SOCIETIES—*designation of beneficiary.* The charter, by-laws, rules, etc., of a benefit society in force at the time of the death of a member, control the determination of the validity of the designation of a beneficiary.

9. BENEFIT SOCIETIES—*statutory regulation.* Where a statute enlarges the class of persons who may be designated as beneficiaries of the members of certain benefit societies, the same becomes a part of the charter without formal adoption.

10. BENEFIT SOCIETIES—*when brother of member may be beneficiary.* Where at the time of the death of a member of a benefit society the charter as broadened by statute permits "relative by blood" to be named as beneficiaries, a brother is a proper beneficiary.

Appeal from the Circuit Court of Cook county; the Hon. GEORGE A. CARPENTER, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1909. Affirmed on rehearing. Opinion filed August 12, 1912.

CANNON & POAGE, for Margaret E. Keefe, appellant.

JOHN B. HEINEMANN, for Joseph F. Purcell, guardian *ad litem* for Celeste Keefe, appellant.

WILLIAM A. DOYLE, for appellee, James E. Keefe; JOSEPH J. THOMPSON, of counsel.

CHARLES J. KAVANAGH, for appellee, National Union; GEORGE P. KIRBY, of counsel.

MR. JUSTICE GRAVES delivered the opinion of the court.

Appellee, the National Union, a mutual benefit society, organized under the laws of Ohio and doing business there and elsewhere, including the State of Illinois, commenced this suit in the Circuit Court of Cook county by filing its bill of interpleader, acknowledging its liability on a benefit certificate for $5,000, issued in 1892 to Edward F. Keefe, in which one James E. Keefe, a brother of Edward, was named as beneficiary, and alleging that the said James E. Keefe and one Margaret E. Keefe each claimed the fund; that the said James claimed as the original and only designated beneficiary and that Margaret claimed as a substituted beneficiary, and asking that the said James and Margaret be required to· come into court and litigate between themselves their respective claims to the fund and that the complainant be discharged, upon bringing the fund into court, from any further liability to either of such claimants.

Both James and Margaret answered this bill, setting out their respective claims substantially as averred in the bill, and the said Margaret setting up the further claim that the designation of James was *ultra vires* the power of the society in that he did not come within any of the classes of persons for whose benefit the society might lawfully issue benefit certificates. The complainant thereupon filed an amended bill, and afterwards filed an amendment to the amended bill, in which amended bill as amended it is averred that many certificates of a like character to the one in question had been issued by it that were still outstanding, the validity of which was likely to be affected by a determination of the question of *ultra vires* raised by the answer of Margaret, and adding to the prayer in the original bill a prayer to be allowed to remain a party to this suit for the purpose of litigating the question of *ultra vires* so raised. By the last amendment Celeste Keefe,

the minor child of Edward, was also made party defendant.

The parties defendant having all interplead, setting up their respective claims to the fund, a decree was entered directing the complainant to bring into court the fund, less certain costs, which being done, the complainant was discharged by the terms of the decree from all further liability in relation to the fund, but was allowed to remain a party to the suit for the purpose of litigating the question of the power of the society to make persons beneficiaries who were standing in relation to its members the same as James stood to Edward. By the final decree of the Circuit Court the fund in question was awarded to James as the lawful beneficiary.

Two separate appeals from this decree were perfected, one by Margaret and one by Celeste by her guardian *ad litem*. These appeals have been consolidated and were heard and will be disposed of together.

The claim of Margaret that she had been substituted as beneficiary in the place of James has been abandoned, but reversal of the decree is asked for the reasons that complainant is not shown to be indifferent between the claimants, but, on the contrary, has taken and is taking an active part in this case in behalf of the claimant James, and against the other two claimants, Margaret and Celeste, and because James did not and does not come within any of the classes that could lawfully be made beneficiaries.

In order to maintain a strict bill of interpleader the complainant must stand absolutely neutral as to the rights of the several claimants to the fund, and when such claimants have interplead, and the fund in question has been brought into court, the complainant should be discharged out of the case and can no longer be heard in it. Where, however, the complainant in a bill seeks some affirmative relief that is personal to such complainant, the bill, while in the nature of a bill

of interpleader, is not strictly one, and the complainant may properly be allowed to remain in the case for the purpose of litigating his right to such affirmative relief. Brocklebank v. Lasher, 109 Ill. App. 627; Heath v. Hurless, 73 Ill. 323.

It is no valid objection to such a bill asking affirmative relief that such relief, if obtained, may affect the determination of the rights of the several claimants to the fund involved.

The case at bar furnishes a good illustration of the distinction between strict bills of interpleader and bills in the nature of bills of interpleader. The first bill filed in this case was a strict bill of interpleader. It disclosed no interest in the complainant, and sought no affirmative relief, but when the power of the complainant society to designate as beneficiaries persons standing in relation to the members of the society the same as James stood to Edward was challenged by the answer of Margaret, the complainant became vitally interested, and amended its bill to show in what manner it was interested and to ask that the question of *ultra vires* so raised be adjudicated. The amended bill praying for that affirmative relief was a bill in the nature of a bill of interpleader, and the complainant was properly allowed to remain in the case for the purpose of having the question of *ultra vires* determined. The fact that the complainant has vigorously asserted its right to designate as beneficiaries persons standing to members in a like relation existing between James and Edward is, in view of the averments in the bill, no evidence of partiality on the part of the complainant for James.

In order to determine whether the society could properly and legally designate James E. Keefe as beneficiary in the certificate in question, and whether, being so designated, he was at the death of Edward, the member, entitled to receive the fund in question, it is necessary to know the history of the transaction.

On March 23, 1892, Lincoln Council of the appellee,

National Union Benefit Society, located at Chicago, Illinois, admitted to full membership in the society Edward F. Keefe, then an unmarried man.    In due time a benefit certificate for $5,000 was issued and delivered to him by the society, in which James E. Keefe was named as beneficiary.    James, the beneficiary so named, was the brother of Edward, the member.    Upon the delivery of this certificate to Edward, he in turn delivered it to James, who retained possession of it continuously until it was introduced in evidence in this case.    There is proof in the record tending to show that Edward joined the society and obtained the certificate, naming James as beneficiary, in pursuance of an agreement with James made in consideration of moneys already advanced and to be advanced by James to Edward, and the agreement by James that he would pay all future dues and assessments on the certificate, and that the moneys to be advanced were advanced and the dues to be paid were paid by James according to such agreement.    In 1897 or 1898 Edward was married to the appellant, Margaret E. Keefe, and as a fruit of that marriage, and before the death of Edward, appellant, Celeste, was born.    The appellee, the National Union, was chartered under the laws of Ohio, May 14, 1881.    At that time the statutes of Ohio provided that societies of its character might make benefits afforded by them payable to *"the families or heirs* of any member at his decease."    The objects of this society, as expressed in the charter, were, in part, as follows:

"Section 3.    It shall be a secret society formed for the mutual benefit of the members thereof, *and their families exclusively,* pursuant to a code of regulations adopted by it for its government."    *    *    *

"Division b, section 4.    To give material aid to the *members and their dependents.*"    *    *    *

"Division e, section 4.    To establish a benefit fund from which upon sufficient proof of death of a beneficial member of the order who has complied with all its requirements a sum not exceeding $5,000 shall be

paid *to the husband, wife, orphans, families, or other dependents as the member may direct."*

In 1887 the articles of incorporation were so amended as to provide, in part, as follows:

Section 3. "It (National Union) shall be a secret order formed and conducted for the mutual benefit of its members and *their families exclusively,* pursuant to such code of regulations by whatever name called as may be adopted by its members in session assembled as the senate of the National Union."

The other provisions above quoted were not changed. In June, 1887, after this change in the articles of incorporation, and long before Edward F. Keefe became a member of the society, the society adopted as a part of its code of regulations, among other things, the following:

Art. 2. "The object of the order shall be    *    *    *"

Sec. 5. "To establish a benefit fund from which upon sufficient proof of death of a beneficial member of the order who has complied with all its lawful requirements, a sum not exceeding five thousand dollars shall be paid to such member or *members of the family of the deceased who are related to him by consanguinity or affinity* as may have been designated by the member in accordance with the laws of the order."

Prior to the time James was married, which was in 1890, his brother, Edward; his brother, John, his sister, and their father and mother all lived together in one home, as one family, which was maintained by James and John, the rest of the family not being producers. After James was married, he set up a separate home for himself, and from that time until after Edward became a member of the society, he was furnished everything he had, including board, clothes, spending money and tuition in college by James. After Edward graduated James bought a business for him and "started him in on his own responsibility." In fact, James seems to have regarded Edward, who was his junior, not only as a member of his immediate family, but as his own special charge, not only providing

for his material wants, but looking out for his moral well being as well, for the evidence discloses that at one time Edward started to work in a saloon without the knowledge of James, and when James found it out he induced him to abandon the job, insisting that a saloon was not a proper place for him to work.

Upon the authority of Tepper v. Royal Arcanum, 61 N. J. Eq. 638; Faxon v. Grand Lodge, 87 Ill. App. 262; Klotz v. Klotz, 15 Ky. Law Rep. 183; Old Peoples' Home Society v. Wilson, 176 Ill. 94; Danielson v. Wilson, 73 Ill. App. 287; Lane v. Lane, 99 Tenn. 639; Hosmer v. Welch, 107 Mich. 470; Wilson v. Cochran, 31 Tex. 677; Hoffman v. Grand Lodge, 73 Mo. App. 47, and Ferbrache v. Grand Lodge, 1 Mo. App. 268, we think that, when Edward became a member, he and James were members of the same family within the meaning of the language of the charter and that the laws of Ohio and the charter, constitution, by-laws, rules and regulations of the society were each and all broad enough, under the facts disclosed by this record, to permit of the designation of James as the beneficiary of Edward, unless the words "or other dependents" in division "e" of section 4 of the charter limits the beneficiaries to *dependent* members of the family. We do not think that language should be so construed. Similar language in the charters of like societies have been construed to authorize the designation of members of the family as beneficiaries without regard to whether such designated beneficiaries were "dependent" or not. Manley v. Manley, 107 Tenn. 191; Lane v. Lane, 99 Tenn. 639; Supreme Assembly Royal Soc. of Good Fellows v. Adams, 107 Fed. 535; Klotz v. Klotz, 15 Ky. Law Rep. 183.

The foregoing authorities seem to be based upon and to be in consonance with the rule laid down in Bacon on Benefit Societies, section 247, *i. e.,* "In determining whether the designated beneficiary comes within the class specified or not, the charter and by-laws shall be construed liberally, so as to carry out the benevolent

purpose of the organization.'' We, therefore, conclude that the original designation of James as beneficiary was clearly within the law and within the charter power, by-laws, rules and regulations of the society then in force. The validity of the original designation is, however, not the controlling question in determining who is entitled to the benefit fund in this case. The vital question is, was James *at the time of Edward's death* a person who might properly be designated as his beneficiary? While a person may be originally a properly designated beneficiary, he acquires no vested rights in the benefit fund thereby, until the death of the member, and if at the death of the member he does not come within the class of persons who could then, under the law and the charter, by-laws, rules and regulations of the society, be designated as a beneficiary, he cannot take the fund. Neither does the heir of a member of such society, who will take the fund, if no legal designation of a beneficiary is made, have a vested interest in the fund until the member dies, and if at the death of the member a named beneficiary exists who then can be properly designated as such, he and not the heirs at law is entitled to the fund. It is the law and the charter, by-laws, rules and regulations of the society in force at the time of the death of the member that must control in the determination of the question of the validity of the designation of the beneficiary. Murphy v. Nowak, 223 Ill. 301; Royal Arcanum v. McKnight, 238 Ill. 349; Grimme v. Grimme, 198 Ill. 265; Baker v. Prebis, 185 Ill. 191; Morey v. Monk, 145 Ala. 301.

Even when, at the time a designation of a beneficiary is made, the person so designated does not come within any of the classes of persons who could lawfully be made beneficiaries and by subsequently enacted valid laws, that have been complied with by the society, and by altered charter, by-laws, rules and regulations of the society the classes of persons who may be made beneficiaries are so extended as to include the bene-

ficiary so previously named, and the membership and certificate are kept alive by the payment by the member, and the acceptance by the society, of all dues and assessments thereafter maturing and a compliance with such subsequently enacted laws, by-laws, rules and regulations and altered charter, such prior designation is validated, then the rights, duties and obligations of all parties are the same as if the new laws, by-laws, rules, regulations and charter had been in force when the designation was first made, or as if the same beneficiary has been redesignated after such new laws, by-laws, rules, regulations and charter were in force. Morey v. Monk, 145 Ala. 301; Park v. Modern Woodmen of America, 181 Ill. 214-228; Bacon on Benefit Societies (3d Ed.), par. 46; Niblack on Benefit Societies (2d Ed.) 162.

Edward died on September 17, 1906, leaving him surviving his brother, James, his wife, Margaret, and his daughter, Celeste. From the time Edward first became a member of the society, until his death, he continued to be a member in good standing, and at his death the certificate was in full force and no change in beneficiaries had been made in accordance with the rules of the society.

The application of Edward for membership in this society contained, among other things, the following: "I agree to make punctual payments of all dues and assessments for which I may become liable and conform in all respects to the laws, rules and usages of the order now in force or which may hereafter be adopted by the same." The certificate contains, among other conditions, the following: "That this friend complies in the future with the laws, rules and regulations controlling said benefit fund or that shall hereafter be enacted by the senate to govern said council and fund. The application of the member, a copy of which is hereto attached, is hereby made a part of this certificate."

In 1893 the general assembly of Illinois enacted a

law to regulate societies of the character of the "National Union," in which it was provided that death benefits might be made payable "to the families, heirs, blood relations, affianced wife of or persons dependent upon the member." This provision of the Illinois statute was in 1894 substituted by the society for Art. 2, sec. 5, of the code of regulations of the society, and in 1896 the same provision, above quoted from the laws of Illinois, was incorporated in the laws of Ohio, and in 1899 the society enacted rules and regulations in compliance with that statute.

The statute of Ohio of 1896 was a new act covering the entire subject of fraternal beneficiary societies, and defines such a society to be "a corporation society or voluntary association, formed or organized and carried on for the sole benefit of its members (and) their beneficiaries," and provided further that "each association shall have a lodge system with ritualistic form of work and representative form of government," and that "payment of death benefits shall be to the families, heirs, blood relatives, affianced husband or affianced wife of or to persons dependent upon the members." That act further provided that "such associations shall be governed by this act." While section 3630 of the laws of Ohio of 1881, under which the National Union was chartered, did not expressly and in terms provide for the formation of corporations of its character with a lodge system and a representative form of government, such system and form of government and ritualistic form of work was not prohibited, and section 3250 of that act did provide for the adoption by such corporations of by-laws "for their government not inconsistent with the regulations of the corporations." It is not pointed out by counsel for appellants and we are unable to discover how such lodge system and ritualistic form of work and representative form of government is inconsistent with the provisions of section 3630 or 3250, or with state regu-

lations of corporations. Certain it is that the National Union did adopt a lodge system and a ritualistic form of work and a representative form of government, and that when the law of 1896 was passed it was recognized by the state authorities of the state of Ohio as an existing fraternal benefit association. As there is nothing in this record to show the existence at that time in Ohio of other societies of the same character having a lodge system, ritualistic form of work and representative form of government, we are bound to assume that the legislature of that state had this appellee in mind when the law of 1896 was passed, in which it was provided that such societies might continue in business, provided they complied with the provisions of that act, regulating annual reports, etc. The proof shows the National Union did continue in business in Ohio, made reports under the provisions of the law of 1896, and that it was licensed so to do business by the State of Ohio, under the provisions of that law until the passage of the law of 1904 by the legislature of that state.

This new statute of 1904 contained, among other provisions, the following:

"SECTION 1. (Fraternal Beneficiary Associations defined.) Any corporation, society, order or voluntary association without capital stock, organized and carried on solely for the mutual benefit of its members and their beneficiaries, and not for profit, and having a lodge system with ritualistic form of work and representative form of government and which shall make provision for the payment of death benefits, is hereby declared to be a fraternal beneficiary association."

"SEC. 4. (Exemptions.) Except as herein provided, such association shall be governed by this act and shall be exempt from all provisions of the insurance laws of this state not only in government relations with the state, but for every other purpose, and no law hereafter passed shall apply to them, unless they be expressly designated therein."

"SEC. 6. (Beneficiaries.) The payment of death benefits shall be confined to the family, heirs, relatives by blood, marriage or legal adoption, affianced husband or affianced wife, or to a person or persons dependent on the member."

"SEC. 8. (Certificate.) Every certificate issued by any association shall specify the maximum amount of benefit provided thereby, and the conditions governing the payment thereof, and shall provide that the certificate, the charter or articles of association, the constitution and laws of the association and the application for membership and medical examination, signed by the applicant, shall constitute the contract between the association and the member and copies of the same certified by the secretary of the association or corresponding officer shall be received in evidence of the terms and conditions of the contract; and any changes, additions or amendments to said charter or articles of association, constitution or laws duly made or enacted subsequent to the issuance of the benefit certificate shall bind the member and his beneficiaries and shall govern and control the contract in all respects the same as though such changes, additions or amendments had been made prior to and were in force at the time of the application for membership."

"SEC. 13. (Powers Retained — Reincorporation — Amendments.) Any association now engaged in transacting business in this state may exercise, after the passage of this act, all of the rights conferred thereby, and all of the rights, powers and privileges now exercised or possessed by it under its charter or articles of association not inconsistent with this act, or it may be reincorporated hereunder. But no association already organized, shall be required to reincorporate hereunder, nor shall it be required to adopt the rates prescribed herein for new associations, in order to avail itself of the privileges of this act, and any such association may amend its articles of association from time to time in the manner provided therein, or in its constitution or laws, and all such amendments shall be filed with the superintendent of insurance and

shall become operative upon such filing unless a later time be provided in such amendments, or in its articles of association, constitution or laws.''

''SEC. 16. (Annual License.) Associations which are now authorized to transact business in this state may continue such business until the first day of April next succeeding the passage of this act, and the authority of such associations may thereafter be renewed annually, but in all cases to terminate on the first day of the succeeding April. For each such license or renewal, the association shall pay the superintendent of insurance twenty-five dollars. A duly certified copy of such license shall be *prima facie* evidence that the licensee is a fraternal beneficiary association within the meaning of this act.''

This new act was a complete act ''Regulating Fraternal Benefit Associations,'' and in terms repealed certain former acts on that subject. While section 3630 of the laws of Ohio of 1881 was not repealed by express terms, it was repealed by necessary implication to the extent that no association like the appellee, as then constituted, could thereafter be formed or exist under its provisions.

Such associations could only be formed or continue in business by complying with the act of 1904. It follows that if the appellee association had any existence at all after the act of 1904 went into force, it was because it had complied with and brought itself under the provisions of that act.

It will be observed that by section 13, above quoted, this association and all like associations then engaged in transacting business in the State of Ohio were authorized to exercise all the rights, powers and privileges conferred by the act, *and* all the rights, powers and privileges exercised under its charter or articles of association *not inconsistent with the act*, if such associations brought themselves within the provisions of the act. *Or* they had the option to reincorporate under the act, but they were not *required* to do so.

By section 16, above quoted, it is provided that such societies, who seek to continue business under the act and without reincorporating, must annually, before the first of April in each year, pay to the State Superintendent of Insurance the sum of twenty-five dollars, and receive a license, and that such license should be *prima facie* evidence that the licensee was a fraternal association within the meaning of the act. This society exercised its option to continue its business without reincorporating, but by paying to the Superintendent of Insurance the sum of twenty-five dollars annually, and the same was accordingly paid and a license was duly issued to it under the provisions of the act of 1904 for the years 1905 and 1906. The society was also duly licensed to do business in the State of Illinois for the same period. The Ohio license for the year 1906 was, in part, as follows:

"I, A. I. Vorys, Suprintendent of Insurance of the state of Ohio, do hereby certify that the National Union, located at Toledo in the state of Ohio has complied in all respects with the requirements of the act of the General Assembly, passed April 26, 1904, regulating Fraternal Benefit Associations, and other laws applicable to it, and is authorized to transact its appropriate business of insurance in this state, as prescribed in said act during the current year.    *    *    *"

The truth of this certificate is nowhere denied, and it being *prima facie* evidence that the holder was a fraternal association within the meaning of the act, for the purposes of this case, it must be regarded as an established fact that the society had complied with the requirements of the act of 1904, and was authorized to do business under and in accordance with the provisions of it.

When a benefit association is formed under a general act, the statute under which it is chartered must be read into and regarded as part of the charter itself. People v. Chicago Gas Trust Co., 130 Ill. 268; City of Danville v. Danville Water Co., 178 Ill. 299-306; Wood v. Mystic Circle, 212 Ill. 532-537; Wallace v. Madden,

168 Ill. 356. And when it is mutually agreed between the member and the society that the member will be governed and will abide by all subsequently enacted laws, such subsequently enacted laws, as soon as, and while, they are in force must be read into and treated as part of the organic law of the society. Supreme Commandery of the Knights of the Golden Rule v. Ainsworth, 45 Ala. 449; Gilmore v. Knights of Columbus, 77 Conn. 58, and numerous cases there cited; Daughtry v. Knights of Pythias, 48 La. Ann. Rep. 1204; Tisch v. Protected Home Circle, 72 Ohio St. 233.

When certificates are issued by benefit societies under stipulations of that character, it has been frequently held that no one has any vested interest in the benefit fund and that subsequently enacted laws changing the classes of persons who may be made beneficiaries are binding on all persons concerned. Mathewson v. Supreme Council Royal Arcanum, 146 Mich. 671, and cases there cited. On this subject Niblack on Benefit Societies (2d Ed.), 162, says:

"Where the law (statute) relating to the classes of beneficiaries who may take the fund of a society has been changed after the organization of the society, so as to include other beneficiaries than those first enumerated, the designation by a member of a beneficiary from an added class of beneficiaries is a designation to which the society has a right to assent, and does assent by issuing a certificate to the member payable to such beneficiary with knowledge that the beneficiary is one of the added class. A mutual benefit society was incorporated under a law providing for the accumulation of a fund 'for the purpose of assisting the widows, orphans, or other persons dependent upon deceased member.' Afterward, the law was so amended as to read, 'for the purpose of assisting widows, orphans, and other relatives of the deceased members.' The society did not adopt the statute amending the act under which it was incorporated. A person who became a member after the amendment of the law designated, as his beneficiary, his mother, who was not then, or at any time afterward, dependent upon him for

support. Subsequently the member married, and died in good standing in the society, leaving his widow and his mother surviving him. It was held under these facts that the amending statute needed no formal adoption by the society, that the designation of his mother was such as he could legally make at that time, as the law which permitted a relation, merely, not being necessarily a dependent, to be designated, was in force when he made his designation, and that his mother was entitled to receive the fund. Again: 'Where the organic law of a society, the statute under which it is incorporated, is amended by an act which does not require formal adoption by existing societies, and the powers of societies are thereby enlarged by adding to the persons who may become beneficiaries, a member may, with the consent of the society, make a new designation which can only be lawfully made by virtue of the later statute. In such case it cannot be said that the society was exercising, and was only authorized to exercise, the more limited powers which it had under the earlier statute.' '' Niblack on Ben. Soc. (2d Ed.), par. 230.

Bacon in his work on Benefit Societies (3d Ed.), in par. 46, says:

''A statute enlarging the powers of a beneficiary society takes effect without formal adoption by the society, and when, after such legislation, an application for membership is accepted it cannot be said, in the absence of any express determination on the part of the association, that it was exercising the more limited powers under the earlier statute.'' Again: ''It has been held that the association is not obliged to formally accept the provisions of an enlarging statute which applies to certificates issued before the act was enacted.'' Bacon on Ben. Soc. (3d Ed.), par. 244a.

See also Supreme Council of L. of H. v. Neidelet, 81 Mo. App. 602; Baldwin v. Begley, 185 Ill. 180-188.

We think the society did all it was called upon to do to bring itself under the provisions of the laws of Ohio of 1904, above quoted, and that after the passage of that law and the obtaining of the license from the Superintendent of Insurance the provisions of the law

of 1904 must be read into the charter of the society. That law so read into the charter broadens it so as to authorize the payment of death benefits to the family, heirs, relatives by blood, marriage or legal adoption, affianced husband or affianced wife of or to a person or persons dependent on the member when designated as beneficiaries. The charter, as so amended, and the law by which it was so amended, were both in force when Edward died. The charter and by-laws of the society at that time authorized the designation of the families, heirs, blood relations, affianced wife or persons dependent upon the member as beneficiaries. There was, therefore, at the time of the death of Edward, no requirement, either in the law under which the association was chartered or in the charter, constitution, by-laws, rules or regulations of the society, that the beneficiary should be of the household of or dependent on the member. James, the beneficiary named, being a brother of Edward, the member, came within the class described as blood relations, and was in every way a proper person to be designated as the beneficiary within the requirements of the law of Ohio, where the association was organized, the law of Illinois, where Edward became a member, and the charter, constitution, by-laws, rules and regulations of the society as the same were in effect at the time of the death of Edward.

We conclude, therefore, that James, when he was designated as a beneficiary of Edward, was a member of the same family with Edward, in the sense in which that term is used in the charter of the society, and that he was properly designated as a beneficiary, and that he, being a blood relation of Edward, was at the time of the death of Edward a proper beneficiary and entitled to recover the fund decreed to him by the Circuit Court.

The decree of the Circuit Court is, therefore, affirmed.

*Decree affirmed.*